IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANTONIUS M. HEIJNEN,

    Plaintiff,

v.                                  Civil No. 03-1338 WJ/KBM

LOU DEFRANCO a/k/a LEONARDO DURKACZ
a/k/a LEONARD DURKACZ, and PAUL
JENNINGS a/k/a PAUL A. JACOBS, and MARK
THOMAS a/k/a JEFF VANDERSTOEP,

    Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

THIS MATTER comes before the Court pursuant to Defendants' Motion to Dismiss [Docket No. 3]. Having reviewed the submissions of the parties, the record in this case, and the applicable law, the Court finds the motion is well taken and will be granted.

**BACKGROUND**

Plaintiff filed a Complaint in the Second Judicial District Court, County of Bernalillo, State of New Mexico on October 20, 2003. Named as Defendants in the Complaint were Lou DeFranco, Paul Jennings, and Mark Thomas. The Complaint alleges that Defendants breached a contract with H&R Financial Limited (H&R), a corporation of which Plaintiff is president. The Complaint also alleges that the Defendants defrauded Plaintiff and embezzled funds from Plaintiff. Specifically, Plaintiff alleges that Defendant Jennings introduced Defendant DeFranco to Plaintiff.

Plaintiff, for and on behalf of H&R, and DeFranco then entered into a contract, signed by DeFranco, by which DeFranco turned over to H&R legal ownership of 100 million US dollars (USD) in a bank account. Under the contract, H&R was to invest these funds in Medium Term Notes for a return on the investment of 129% per week with DeFranco getting a return of 100% per week and Plaintiff getting the 29% per week as profits for himself. The contract was dated September 10, 2001.

Plaintiff alleges that Defendant Thomas was a banker with KeyBank in which the funds were deposited. By Deed of Assignment dated October 13, 2001 and signed by Defendant DeFranco, all rights, title and interest in a specific bank account at KeyBank were transferred to H&R. On October 24, 2001, a letter was sent from KeyBank to H&R, attention to Plaintiff, confirming an account at KeyBank in the name of H&R with a balance of 100 million USD. The letter also states that the personal contact at the bank regarding the account is Mark Thomas. Plaintiff alleges that on December 14, 2001, he was informed by Mark Thomas that the account at KeyBank had been closed and that the funds in the account had been returned to DeFranco. Plaintiff's claims are based on the allegedly illegal and unauthorized transfer of funds out of an account in which H&R had the sole legal interest and he, personally, was the sole signatory.

As damages, Plaintiff is claiming 2.32 billion USD in lost profits, trebled to 6.96 billion USD pursuant to New Mexico state law regarding racketeering. The lost profits are calculated by multiplying Plaintiff's anticipated return of 29 million USD per week by the approximately 80 weeks between December 14, 2001 and the date he filed his Complaint. Plaintiff is also claiming the loss of secondary profits on the grounds that he could have invested his profits in the Medium Term Notes for 129% return per week and could have "compounded" his investment by

continuing to reinvest the profits. Plaintiff acknowledges the amount of lost secondary profits is an astronomical sum.[1] Therefore, Plaintiff only seeks an award of damages for secondary loss of profits of a single investment of his own at 100 million USD over a period of 76 weeks without compounding the interest. He calculates this amount as 6.84 billion USD.

On November 20, 2003, the United States, on behalf of the named Defendants, filed a Notice of Removal. On the same date, Assistant United States Attorney Phyllis A. Dow entered her appearance on behalf of the named Defendants. Evidence provided by the United States in

---

[1]The Court does not pretend any expertise in economics or mathematics, but roughly calculates that the first four weeks of profits from DeFranco's investment (29 million a week) would be used to accumulate the minimum investment of 100 million dollars Plaintiff would need for his own investment in Medium Term Notes. Beginning with an investment in the fourth week of 116 million (29 million times 4), Plaintiff would earn 129% on this the following week, reinvest this amount plus the 29 million received from DeFranco's investment, "compound" his profits, and more than double his money every week. The fifth week's profit would be approximately 166 million, the sixth week's profits would be about 417 million, and, by the seventh week, the profits would total more than one trillion dollars. By the eighteenth week, Plaintiff's return would be over 9 trillion dollars, enough to pay off the national debt of the United States (a mere 7 trillion and change as of January 2004). In the twenty-fourth week, the profits would total more than one quadrillion dollars, enough to distribute more than $150,000 to each of the more than 6 billion persons on Planet Earth. In the thirty-second week, the profits would be more than one quintillion dollars (the equivalent of one hundred thousand trillion or one million billion and represented by the number 1 followed by 18 zeros or 10 to the 18th power. At this point, if the profits were distributed among the Earth's population, each person would receive over 150 million dollars and each could begin their own investment in Medium Term Notes). In the forty-first week profits would reach more than one sexillion dollars (sexillion is represented by the number 1 followed by 21 zeros or 10 to the 21st power). Profits would reach more than one septillion dollars (10 to the 24th power) in the forty-ninth week, more than one octillion dollars (10 to the 27th power) in the fifty seventy week, two nonillion dollars (10 to the 30th power) in the sixty-sixth week, more than one decillion dollars (10 to the 33rd power) in the seventy-fourth week, and, at the eightieth week, more than 239 decillion dollars. If one decillion (much less 239) dollars was divided among the Earth's population, each person could receive a lump sum of 166 septillion dollars, or, without taking into account any annuity earnings, could receive 16 quintillion, 600 quadrillion dollars a year for one million years. In other words, these amounts of money are beyond meaningless. Plaintiff was correct that his alleged lost secondary profits were astronomical.

response to a motion by Plaintiff for default judgment indicates that the named Defendants are Agents with the Federal Bureau of Investigations (FBI), that the names Lou DeFranco, Paul Jennings and Mark Thomas are pseudonyms used by the Agents in an undercover investigation of a High Yield Investment Program fraud scheme, and that the contract which is the subject of Plaintiff's Complaint was entered into by Agent Durkacz (DeFranco) as part of the FBI undercover operation.  The United States also provided evidence that Plaintiff, as a result of the FBI investigation, was convicted in the United States District Court, District of South Carolina on one count of Conspiracy to Commit Wire Fraud and four counts of Commission of Wire Fraud and Aiding and Abetting in the Commission of Wire Fraud.  Plaintiff does not dispute these facts and notes that he is currently incarcerated.  However, Plaintiff argues that Agent Durkacz entered into the contract "outside the color of law" in that he did not have authority within his position as an FBI Agent to enter into the contract, and that the contract is thereby a valid contract binding Agent Durkacz personally.  Plaintiff also argues that his conviction is infirm for a variety of reasons.

On November 26, 2003, Plaintiff filed a motion for default judgment stating that Defendants had been properly served and had failed to answer the Complaint or otherwise defend in the case.  Plaintiff's evidence on the motion showed that a copy of the summons and complaint from the state court action were sent by certified mail to Defendant DeFranco, Defendant Jennings and Defendant Thomas.  The United States defended the motion by noting that no provision of New Mexico state law or the Federal Rules of Civil Procedure permits service by certified mail.  The United States additionally noted that it had timely defended in the case by filing a motion to dismiss pursuant to Fed. R. Civ. P. 12 on November 26, 2003, less than five (5)

days, not including weekends and holidays, See Fed. R. Civ. P. 6(a), from the date of removal. Finally, the United States pointed out that Plaintiff had failed to serve Defendants in accordance with Fed. R. Civ. P. 4(i) which applies to suits against the United States and its officials, officers and employees whether sued in their official or individual capacities when the suit is for acts or omissions occurring in connection with the performance of duties on behalf of the United States. On January 12, 2004, this Court denied Plaintiff's motion on the basis that Plaintiff had failed to properly serve the Defendants, and that Defendants, by filing the Rule 12 motion had timely defended in any event. See Docket No. 19.

On November 26, 2003, Defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(5) for insufficiency of service of process.

**LEGAL STANDARD**

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(5) is essentially a motion to dismiss for lack of jurisdiction. See F.D.I.C. v. Oaklawn Apartments, 959 F.2d 170 (10th Cir. 1992). Therefore, a party may go beyond the allegations in the pleadings to challenge the facts upon which jurisdiction depends and may rely on affidavits or any other evidence properly before the court. Id. at 174. In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion. See Id.; see also Fed. R. Civ. P. 12(b) (stating that motions under 12(b)(6) convert to motions for summary judgment when matters outside the pleadings are considered).

**DISCUSSION**

As noted, Defendants' Motion to Dismiss challenges the sufficiency of service of process and urges that this Court lacks personal jurisdiction over the Defendants based on insufficient

5

service.  Under Fed. R. Civ. P. 4(m), Plaintiff had 120 days from the filing of his Complaint to effect proper service on the Defendants.[2]  Plaintiff's Complaint was originally filed October 20, 2003 and Plaintiff had until February 17, 2004 to properly serve the Defendants in this case. Thus, the time for Plaintiff to cure any defects in service has expired.

The United States urges that Plaintiff was required to serve Defendants in accordance with Fed. R. Civ. P. 4(i).  Rule 4(i) addresses service on the United States, its agencies, corporations, officers or employees.  While Plaintiff concedes that the named Defendants are FBI agents, he appears to argue that their acts and omissions with regard to Plaintiff and the contract to which Plaintiff's Complaint refers were taken by the agents as individuals such that Rule 4(i) does not apply.

The allegations of the Complaint in light of the evidence in this case make clear that the named Defendants' acts or omissions with regard to Plaintiff and the contract to which Plaintiff's Complaint refers occurred in connection with the Defendants' performance of duties on behalf of the United States.  Therefore, Rule 4(i) governs service of process in this case.

Rule 4(i)(2)(B) requires that service on an officer or employee of the United States sued in his or her individual capacity for acts or omissions occurring in connection with the performance of duties on behalf of the United States is effected by serving the United States in accordance with 4(i)(1).  Under Rule 4(i)(1), service on the United States is effected by (A) delivering a copy of the summons and complaint to the United States Attorney for the district in which the action is

---

[2]Plaintiff argues that the Federal Rules of Civil Procedure do not apply because he filed his Complaint in state court.  Under the Erie Doctrine, a federal court generally applies federal procedural rules even assuming Plaintiff's cause of action arises under state law.  See Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938).

brought; and (B) by sending a copy of the summons and complaint by registered or certified mail to the Attorney General of the United States.

Rule 4(i)(2)(B) also requires that service on an officer or employee sued in his or her individual capacity be served individually in accordance with 4(e),(f) or (g).  Rule 4(e), the provision applicable in this case,[3] permits service on an individual (1) in accordance with the law of the state in which the court is located; or (2) by delivering a copy of the summons and complaint to the individual personally or by leaving copies at the individual's dwelling house or usual place of abode with some person of suitable age and discretion or by delivering a copy to an agent authorized by appointment or by law.

The record in this case discloses that Plaintiff sent a copy of the complaint and summons to each Defendant by certified mail.  This Court has already determined that this method of service was insufficient.  See Order Denying Plaintiff's Motion for Judgment by Default filed January 12, 2004 [Docket No. 9].  Plaintiff has made no further attempts to effect proper service on the Defendants.  Thus, it is appropriate that Plaintiff's Complaint be dismissed.  See Jones v. Frank, 973 F.2d 872, 873-74 (10th Cir.1992).

**CONCLUSION**

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss [Docket No. 3] is hereby GRANTED and Plaintiff's Complaint is hereby DISMISSED without prejudice.

_____
UNITED STATES DISTRICT JUDGE

---

[3]Rule 4(f) governs service on individuals in a foreign country.  Rule 4(g) governs service of infants and incompetent persons.